RELIANCE INSURANCE COMPANY

v.

GENERAL REINSURANCE CORP.

Civ. A. No. 79-2500.

United States District Court,
E. D. Pennsylvania.

Dec. 18, 1980.

Perry S. Bechtle, LaBrum & Doak, Philadelphia, Pa., for plaintiff.

Robert M. Landis, Richard L. Berkman, Dechert, Price & Rhoads, Philadelphia, Pa., for defendant.

MEMORANDUM OPINION AND ORDER

WEINER, District Judge.

This is an action by plaintiff Reliance Insurance Company (Reliance) for recovery of an insurance claim allegedly due under a re-insurance certificate issued to it by defendant General Reinsurance Corporation (General) on an excess umbrella policy. Trial was held before this court sitting without a jury. For the reasons which follow judgment will be entered n favor of the defendant.

I

This case had its origin in a motor vehicle collision which occurred on November 16, 1969, between a truck insured by Reliance and a jeep driven by Robert Blackwood (Blackwood). Blackwood was seriously injured and became a paraplegic. Reliance insured the truck under an automobile liability insurance policy issued to its insured, Desert Ginning Company (Desert), for a maximum of $300,000.00. Blackwood brought suit in California Superior Court, County of Riverside, against Desert, which suit was defended by Reliance.

Since Reliance did not have a local claims office, it retained General Adjustment Bureau (GAB) to investigate the accident, to employ such experts as might be necessary, including an accident reconstruction expert, and to attempt to reach a settlement with Blackwood.

On December 2, 1969, a GAB adjuster and Fred Cady (Cady), an accident recon-

struction expert retained by GAB, examined Blackwood's jeep, which at the time was parked in Blackwood's driveway. Cady removed certain parts from the jeep, in particular the left turn signal. At a subsequent trial in California, Cady testified that he had no permission from anyone to take parts from the jeep, but had assumed that GAB had obtained the necessary permission.

On July 24, 1970, Cady submitted his report to GAB, and advised that he had taken the left turn signal from the jeep, and requested instructions concerning storage of the parts. After Reliance's Los Angeles office received the report on July 27, 1970, that office instructed GAB's Claims Manager to return the parts. Reliance subsequently paid Cady for his services.

On December 4, 1969, James Dwinnell, (Dwinnell) manager of GAB's office in Riverside, California, telephone Blackwood at the Loma Linda Hospital. Blackwood asked whether Dwinnell was from Allstate, Blackwood's insurer. Dwinnell answered that he was working with Allstate. Blackwood then discussed the accident with him. Afterwards, Dwinnell transcribed the statement and brought it to Blackwood for his signature. Blackwood refused to sign it, having been warned not to sign anything while he was in the hospital. Dwinnell thereupon told Blackwood that if Blackwood didn't sign it, he'd get a lawyer or judge to make Blackwood sign it. Dwinnell also threatened to terminate the disability payments Blackwood was receiving unless he signed the statement.

On April 16, 1970, Blackwood settled his claim against Desert for $200,000.00. Several months later, in the summer of 1970, Blackwood learned of the removal of the jeep parts, and filed suit in California against Reliance, GAB, Cady and his employer, Stephen Blewett & Associates (Blewett), seeking compensatory damages, alleging that as a result of the defendants' conduct in removing the turn signal and securing the statement, Blackwood's injury was aggravated and his health impaired so that it became physically and emotionally impossible for him to proceed to trial, thus requiring him to settle his case at a great discount of its true value. The suit further claimed punitive damages as a result of the defendants' allegedly outrageous conduct.

Reliance was sought to be held liable on the theory of ratification, i. e., that Reliance, as principal, ratified the actions of its agents in wrongfully taking the jeep parts and in the solicitation under false pretenses of the statement from Blackwood.

Trial was held in the Superior Court of California, County of Riverside, in July, 1975. At the trial, Blackwood sought to prove as an element of compensatory damages that he was forced to settle his original personal injury action for less than its true value because the taking of the jeep turn signal by Cady significantly impaired his ability to prove liability. The trial court ruled that Blackwood was not entitled to recover compensatory damages because of this loss.

The jury returned a special verdict which included the following findings:

1. GAB acted maliciously, oppressively and fraudulently toward Blackwood;
2. Cady acted oppressively toward Blackwood, but not maliciously or fraudulently;
3. Reliance ratified the acts of Cady and GAB with reference to the jeep parts incident, and ratified the acts of GAB with reference to the written statement incident.

The jury returned a verdict of $50.00 compensatory damages and $8,000,000.00 punitive damages against Reliance, $50.00 compensatory damages and $250,000.00 punitive damages against GAB, and $5.93 compensatory damages and no punitive damages against Cady and Blewett. In response to the special interrogatories submitted to it by the court, the jury indicated that in the punitive damage award against Reliance, $1,000,000.00 was based on the jeep parts incident, and $1,000,000.00 was based on the written statement incident. The court reduced the punitive damage award accordingly, and entered judgment

in favor of Blackwood and against Reliance in the amount of $2,000,000.00 punitive damages.

Cross appeals from the trial court judgment were taken to the California Court of Appeal, Fourth District, by Blackwood and Reliance. Blackwood sought reinstatement of the $8,000,000.00 punitive damage verdict, and also a new trial because of the trial court's alleged error in refusing to permit him to prove a diminution in the value of his claim resulting from the alleged wrongful acts which gave rise to the suit. Reliance sought a new trial on the grounds that under California law it could not be held liable to Blackwood on a theory of ratification, and also because of various alleged trial errors.

At the time of the occurrences referred to in the California trial, Reliance was insured as follows:

Reliance had issued to itself a General Liability and Automobile Policy (6A 1 27 68 10) with liability limits of $500,000.00 for each "occurrence" and $500,000.00 in the aggregate for both bodily injury and property damage. The policy defined "occurrence" as "an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured." Endorsement # 25 to the policy provided that: "the insurance afforded by the policy for bodily injury and property damage applies as respects any negligent act, error, or omission which arises from the business activities of .... claim adjusters and claim representatives irrespective of whether such persons are employees of the named insured or not." "Damages" was defined under this policy as including: "damages for death and for care and loss of services resulting from bodily injury and damages for loss of use of property resulting from property damage."

Reliance had also issued to itself an Excess Umbrella Policy (LU 1 24 51 00), which provided for payment:

"for all sums which the Insured [Reliance] shall be obligated to pay by reason of the liability

(a) imposed upon the Insured by law, or

(b) assumed under contract or agreement by the Named Insured and/or any officer, director, stockholder, partner or employee of the Named Insured, while acting in his capacity as such,

for ultimate net loss on account of:

(a) personal injuries, including death at any time resulting therefrom,

(b) property damage....

caused by or rising out of each occurrence happening anywhere in the world, during the policy period."

"Occurrence" was defined in the Excess Umbrella Policy as:

[A]n accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, property damage or advertising liability during the policy period. All such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence."

"Personal injury" was defined in the Excess Umbrella Policy as including "bodily injury, sickness, disease, disability, shock, mental anguish and mental injury."

"Property damage" was defined in the Excess Umbrella Policy as "injury to or destruction of tangible property."

The definition of "ultimate net loss" under the Excess Umbrella Policy specifically excluded legal fees.

The Excess Umbrella Policy (LU 1 24 51 00) had a $5,000,000.00 limit per occurrence, and an aggregate limit of $5,000,000.00 with a deductible of $500,000.00 for each occurrence. Reliance admits that the Excess Umbrella Policy (GA 1 27 68 10) included no specific endorsement, similar to Endorsement # 25 of the general liability policy, extending coverage of the policy to personal injuries or property damage for negligent acts of claim representatives.

Pursuant to a reinsurance certificate (F42196) issued by it, General accepted

100% reinsurance on the Reliance Excess Umbrella Policy (LU 1 24 51 00) with a $5,000,000.00 limit for each occurrence, and $5,000,000.00 aggregate, for "BI and/or PD Liability combined in excess of underlying insurance or a $500,000.00 self-insured retention applicable to uninsured perils."

On August 15, 1975, Reliance gave its first notice of loss to General. On September 18, 1975, Donato Socci, an officer of General, wrote Reliance acknowledging receipt of the preliminary notice of loss and advising Reliance to "consider our position at this time as being one of entertaining doubts as to coverage for this loss both on your primary level and on our reinsurance certificate."

In December, 1975, Reliance advised General of contemplated settlement discussions. General abstained from participation in these discussions so as not to prejudice its position regarding coverage. On June 11, 1976, Reliance advised General that "settlement had been agreed upon with Reliance's contribution to be approximately $900,-000.00." On July 27, 1976, General was advised by Reliance of the total amount of the settlement, $1,221,133.00, but that the exact amount of Reliance's contribution had not yet been worked out. On August 6, 1976, Reliance informed General that the Reliance share would approximate $900,-000.00, depending upon the final adjusted premium for an annuity for Blackwood.

A written "Settlement Agreement" between Blackwood and Reliance was dated August 9, 1976. That document stated that it memorialized an oral agreement between the parties entered into on July 9, 1976. The written agreement stated that:

"It is the opinion of counsel for both Blackwood and Reliance that the pending appeals are likely to and should result in a reversal of the present judgment against Reliance, a retrial in which Plaintiff would be permitted to prove compensatory damages for loss caused by the diminution in the value of his personal injury action as a result of the wrongful action of Cady, that Reliance would be liable for said damages under the doc-

trine of respondeat superior, and that said damages would be very substantial."

Reliance informed General on January 28, 1977, that the Reliance share of the settlement was $912,044.34 and that the settlement had been paid.

On August 4, 1976, Mr. Socci of General wrote Reliance a "formal declination of coverage" letter, and set forth the reasons for that action. General asserted that the acts complained of and which formed the basis of the jury verdict were not within the policy definition of "occurrence" for which coverage had been extended; that the policy offered no coverage for the punitive damages awarded to Blackwood; and that if the acts complained of could be deemed "occurrences", Reliance's losses were caused by two separate and distinct occurrences, as attested to by the answers to the special jury interrogatories, each of which would involve a separate $500,000.00 deductible under the reinsurance certificate.

On October 19, 1976, Blackwood and Reliance filed a Joint Application for a Stipulated Reversal of Judgment. General was not advised of the filing before that action was taken. On January 8, 1977, the California Court of Appeal, after "an opportunity to decide the merits of the dispute between Blackwood and Reliance" and between Blackwood and GAB, granted the Joint Application for a Stipulated Reversal, summarily reversed the judgment of July 25, 1975, as between Blackwood and Reliance, and as between Blackwood and GAB, and remanded the action to the California Superior Court for retrial of all issues, with "the case to be restored to the status quo as it existed prior to the original trial."

The reasons stated by Blackwood and Reliance for the "Joint Application for Stipulated Reversal of Judgment and Remand of Action to Riverside County Superior Court were as follows:

"It is the purpose of the parties in seeking this stipulated reversal of the judgment to place the parties in the position they would be in were this appeal prosecuted to its conclusion and the result

achieved, which in the opinion of counsel, is merited by the record and the applicable law. It is in the interests of the parties and the proper administration of justice that such a result be achieved for the following reasons:

1. Reliance is of the opinion that an award of punitive damages against it is not warranted by the evidence or by the underlying facts; that such an award of punitive damages is a serious and unwarranted stigma against its reputation in the insurance industry; and that, if such a judgment were allowed to become final and permanent, it would have adverse effects upon Reliance's future business image and interests.

2. That it is in Blackwood's interests that a stipulated reversal be entered in order that he may obtain recovery based upon a proper application of the law, which would permit him to obtain damages to compensate him for the loss he sustained as a result of the wrongful conduct alleged in the complaint in the present action.

3. It is in the interests of justice that this Court grant the relief requested for the reasons that (a) the relief sought is consistent with applicable principles of California law as applied to the facts of this case reflected in the record on appeal and (b) it will allow the Court to reach this result without the need for exhaustive and detailed briefing by the parties and review of the record by this Court. In this regard, however, Blackwood and Reliance are willing to furnish to the Court such briefing and analysis as the Court may request in order to satisfy itself that the requested stipulated reversal of the judgment is in the interests of justice and compatible with governing principles of California law.

The Joint Application also stated that counsel for Reliance "is of the opinion ... that ... [Blackwood] should have been permitted to prove ... [the] element of loss resulting from Cady's action, and that upon such proof Blackwood would have been entitled to a substantial award of compensatory damages for this element of loss." It

further stated that Blackwood's counsel "is satisfied that Reliance would be entitled to a reversal of judgment and a retrial ..." on the grounds of lack of evidence of ratification by Reliance or in support of the excessive punitive damages.

On June 30, 1977, Reliance sent an Excess Reinsurance Notice to General, requesting payment of $412,044.34, representing Reliance's share of the settlement in the amount of $912,044.34 less the $500,000.00 deductible. The "Description of Accident or Occurrence" on which the notice was claimed to be based stated as follows: "Claimant alleges agent of Reliance coerced him into giving a statement; and removed evidence without authorization." This action ensued when General refused payment to Reliance. The parties have stipulated that the amount in controversy is $402,-044.34.

II

Reliance contends that the settlement agreement between Blackwood and Reliance, which resulted in the loss suffered by Reliance, was based upon the opinion of counsel for both Blackwood and Reliance that an appeal from the California Trial Court judgment would produce a reversal and an order for a new trial. It contends that counsel for both parties believed that upon retrial Blackwood would be permitted to prove and recover damages for the diminution in value of his underlying tort claim stemming from the actions of Cady and Reliance. Reliance claims that belief was correct because the California Court of Appeal, Fourth District, in granting the joint application by stipulation and in summarily reversing the trial court judgment as between Blackwood and Reliance, stated that:

"We have had an opportunity to decide the merits of the dispute between Blackwood and Reliance and conclude that legal grounds exist for granting the application.

.    .    .    .    .

[T]he case is to be restored to the status quo as it existed prior to the original trial of the action."

Reliance asserts that the $200,000.00 that Blackwood originally took for settlement of his first lawsuit against Desert for personal injuries was "far less than the true value of his case." Reliance further asserts that reversal of the California Trial Court was proper because there was little evidence to support a finding of liability based on ratification, and because there was insufficient evidence to support the punitive damage award. Reliance would have us conclude that the $912,044.34 it paid in settlement was a compromise of the compensatory damage award which might have resulted from a new trial, and not a compromise of the punitive damage award. Reliance further contends that there was but one "occurrence" under the terms of the policy, namely, the failure of Reliance to monitor the claims process, and that the settlement made no distinction between the two "episodes" (taking the jeep parts and soliciting the statement) which comprised that "occurrence." Thus, Reliance asserts, its claim is one for which coverage was specifically provided under the underlying policy (Endorsement # 25), implicitly provided under the Excess Umbrella Policy, and expressly reinsured by the reinsurance certificate issued by General.

Alternatively, Reliance argues that coverage of its claim is provided for under the insurance policies and reinsurance certificate even if the settlement is viewed as being based solely upon the punitive damage award.

General argues that the losses for which Reliance is seeking to recover did not arise out of either personal injuries or property damage within the meaning of the Excess Umbrella Policy and the reinsurance certificate but rather out of Blackwood's claim against Reliance for the allegedly intentional tortious acts of fraud, deceit, trespass and conversion. General further contends that the Excess Umbrella Policy, unlike the underlying General Liability and Automobile Policy, contained no express provision as to coverage for "any negligent act, error, or omission which arises from the business activities of . . . claim adjusters and claim representatives irrespective of whether such persons are employees of the named insured or not." Moreover, according to General, even the general liability policy appears to exclude coverage for the willful or intentional conduct of claim representatives. General urges us to distinguish between claims arising from accidents producing personal injuries and those arising from the subsequent allegedly tortious conduct by the insurer or its agents in connection with the investigation of such accidents.

In addition, General argues that the Reliance claim concerns punitive damages, and that neither the Excess Umbrella Policy nor reinsurance certificate expressly provide coverage for punitive damages, nor was such coverage intended to be provided. It is further argued by General that under the applicable law, the assessment of punitive damages cannot be considered to arise under the contractual language of the insurance policies, as such an interpretation would subvert the purpose of punitive damages by allowing a tort-feasor to shift the burden of such an assessment to an insurance company which had committed no wrong.

General also argues that there can be no recovery by Reliance because under the definition of "occurrence" contained in the Excess Umbrella Policy, there were two separate "occurrences" which form the basis of the claim. As a result, they claim that recovery is prevented under the terms of the policy by Reliance's obligation of self-insurance. If there were two occurrences, General would have no liability since there would be two deductibles of $500,000.00 each, or a total of $1,000,000.00, and Reliance's total claim is only $912,044.34.

### III

We can find no basis for Reliance's assertion that the $912,044.34 it paid in settlement represented payment for compensatory damages for which the reinsurance certificate provided coverage. Rather, the settlement can only be viewed as representing a compromise of the $2,000,-000.00 punitive damage judgment which at

the time of the settlement agreement was still of record.

The crux of Reliance's argument is that the settlement of Blackwood's claim was made in anticipation of a possible compensatory damage award which might result upon a reversal of the California judgment and grant of a new trial. At the time the settlement was agreed to, however, in the summer of 1976 (General was notified by Reliance of the settlement on June 11, 1976; a written agreement was dated August 9, 1976, and stated that it memorialized an oral agreement entered into on July 9, 1976) neither Blackwood nor Reliance knew whether a new trial would be granted, or whether evidence of the alleged diminution in value of Blackwood's personal injury claim would be permitted at such a trial. In fact, the Joint Application for a Stipulated Reversal was not even filed by Blackwood and Reliance until October 19, 1976, several months after General was notified that Blackwood and Reliance had reached agreement for a settlement.

Moreover, both Blackwood and Reliance had already filed cross-appeals from the trial court judgment. Yet Reliance did not argue for a new trial on the grounds that Blackwood should have been permitted the opportunity to prove his diminution in value claim until it had reached a settlement with Blackwood of all claims against it. It was only then that Reliance joined with Blackwood in regard to that issue in the written Settlement Agreement and in the Joint Application for Stipulated Reversal of the trial court judgment.

This is quite understandable, of course, as absent some extraordinary situation, Reliance could not be expected to have joined in such an argument, and thereby potentially expose itself to even further liability and an even larger judgment. An extraordinary situation, though, was precisely what existed when Reliance adopted that argument, because by that time it had already settled Blackwood's claims against it. Thus, Reliance was not exposing itself to any additional jeopardy by joining in the application and stipulating to the grounds for reversal.

To the contrary, it seems obvious enough that by joining with Blackwood in the written Settlement Agreement, Reliance was merely attempting to position itself so as to be able to more forcefully assert exactly that argument which it now in fact advances before this court, namely, that the settlement was a compromise of a possible future compensatory damage judgment and not of an actual punitive damage judgment. The written Settlement Agreement and the Joint Application for Stipulated Reversal, together with the argument asserted by Reliance before this court, may be considered examples of shrewd advocacy on the part of Reliance. This court, however, cannot allow itself to be taken in by such skillful legal manuevering.

In the Joint Application for Reversal, Reliance stated that its reason for seeking a reversal and remand for retrial, with the case and parties to be restored to the *status quo ante* which existed prior to the original trial, was that the punitive damage judgment created a "serious and unwarranted stigma against its reputation in the insurance industry ... [which, if] allowed to become final and permanent .. would have adverse effects upon Reliance's future business image and interests." We cannot dispute that such concern on the part of Reliance would provide a motivation for seeking a return of the case and parties to the position they were in before the trial, but it is clear that Reliance had another strong motivation for its actions. Reliance sought to portray its loss, already made certain by virtue of the settlement with Blackwood, as one resulting from compensatory, not punitive damages, and thus more likely, in its view, to be covered by the reinsurance certificate. After all, in September, 1975, close to a year before the Settlement Agreement was entered into, and over a year before the Joint Application was made, Reliance had been advised by General that General had doubts concerning coverage under the insurance policy and reinsurance certificate for Reliance's losses. We must reject Reliance's attempt to distort the true

nature of its loss in an effort to bolster an insurance claim which it had already been advised by General to be of doubtful merit.

The conclusion is inescapable that Blackwood's participation with Reliance in the filing of a joint application for reversal, coming as it did several months after a settlement had been arrived at, was a part of an overall settlement package. As far as Blackwood was concerned, once settlement was agreed to, he would have no further interest in the litigation or in his motion for a new trial then pending before the California Court of Appeal. To be sure, Blackwood would have to take the necessary steps to obtain satisfaction of his judgment and to withdraw his appeal and put an end to the litigation, but he would have no particular reason to seek a stipulated reversal. The particular manner or legal vehicle used to bring the case to an end would be of little concern to Blackwood.

In contrast, Reliance did have reason to seek a stipulated reversal, and for it, the manner in which the case was brought to an end was of great importance. It was only with a reversal and grant of a new trial that Reliance would be in a position to argue that the settlement was in contemplation of a possible compensatory damage award and not of the already adjudicated punitive damage award.

Thus the Settlement Agreement contained a section devoted to an evaluation of the issues on appeal, in which the parties recited the opinion of respective counsel for them both that the then pending appeals were likely to and should be reversed and a new trial granted. The agreement further stated the opinion of counsel that at retrial the plaintiff "would be permitted to prove compensatory damages for the loss caused by the diminution in the value of his personal injury action as a result of the wrongful action of Cady, that Reliance would be liable for said damages under the doctrine of respondeat superior, and that said damages would be very substantial." That statement, together with the statement in the Joint Application regarding recovery of damages by Blackwood to compensate for the loss resulting from the alleged wrongful conduct complained of in that suit, was contrary to the position taken earlier by Reliance in its then pending appeal. We believe Reliance's latter position to be contrived so as to lead General, and now this court, into viewing the settlement as a compromise of a compensatory rather than a punitive damage claim.

It is immaterial that the trial court judgment, which consisted primarily of the punitive damage award, was summarily reversed by the California Court of Appeal after "an opportunity to decide the merits of the dispute." It simply does not follow that merely because the argument advanced in the Joint Application actually resulted in a reversal that the settlement, which had already been agreed upon before the Joint Application and reversal, should therefore be considered as a compromise of a possible compensatory damage claim rather than of the actual punitive damage judgment.

Likewise, for the same reason, even though the appellate court did reverse and remand the case, the question of whether there was sufficient evidence at the trial to support a finding of liability based on Reliance's ratification of the actions of its agents is of no concern to us in our consideration of the case *sub judice.* Even assuming that the evidence at trial was not sufficient we have no reason to believe that it was in anticipation of such a decision on appeal that Reliance was prompted to enter into the settlement, and that the settlement should consequently be viewed as a compromise of a compensatory damage claim. Indeed, if Reliance truly believed that the evidence was in fact insufficient to support liability, it would have little reason for settling a claim for compensatory damages, let alone one for punitive damages.

In addition, we need not make inquiry into the true value of Blackwood's personal injury claim, for even assuming that his claim was severely undervalued as a result of the jeep parts and solicitation of statements incidents, we would not be convinced in light of all of the evidence before us that

the settlement represented a compromise of a compensatory damage claim rather than the punitive damage judgment.

## IV

▓ It is manifest that Reliance cannot recover for its losses unless the losses are covered by the terms of the Excess Umbrella Policy and reinsurance certificate. We have already determined that the $912,-044.34 paid by Reliance in the settlement agreement, which forms the basis of Reliance's claim, represented a compromise of the punitive damage award. Thus, Reliance can prevail in this suit only if that loss, suffered as a result of the settlement of the punitive damage judgment, falls within the coverage of the insurance policy and reinsurance certificate. We have concluded that Reliance's loss is not so covered.

Reliance offered testimony in support of its contention that the Excess Umbrella Policy afforded coverage broad enough to include liability arising out of the business activities of claim adjusters and claim representatives, whether or not such persons were employees of Reliance. According to Reliance, the Excess Umbrella Policy afforded coverage in excess of the underlying liability policy, which had limits of $500,-000.00 per each occurrence and in excess of $500,000.00 for uninsured perils. We reject Reliance's interpretation of the Excess Umbrella Policy.

Coverage for punitive damages is not specifically mentioned in either the Excess Umbrella Policy or the underlying general liability policy. Moreover, the Excess Umbrella Policy contains no provision specifically extending coverage for bodily injury and property damage to the negligent act, error, or omission arising from the business activities of claim adjusters and claim representatives. The underlying general liability policy does contain such a provision, Endorsement # 25. However, the Excess Umbrella Policy does not have that provision, and it is the umbrella policy, not the general policy, which is reinsured by the General certificate. Even Endorsement # 25, or a similar provision, if included in

the Excess Umbrella Policy coverage, would be of no avail to Reliance, for it provides coverage only for the *negligent* acts, errors or omissions of claim adjusters or representatives, not for willful or intentional acts. Cady's conduct in taking the jeep parts and Dwinnell's conduct in securing the statement from Blackwood can hardly be considered negligent acts. Rather, each of these actions clearly were intentional and willful.

The settlement represented a compromise of Blackwood's claims against Reliance and the resulting judgment, consisting primarily of a $2,000,000.00 punitive damage award. The claims, the judgment, and the settlement arose out of the intentional acts of Cady and Dwinnell, agents of Reliance, in removing the jeep turn signal and securing the statement from Blackwood. Thus Reliance cannot recover under the Excess Umbrella Policy and reinsurance certificate as coverage was for bodily injury and/or property damage liability, but not for intentional acts or punitive damages.

## V

▓ Even if we had concluded that the general policy, the umbrella policy and the reinsurance certificate provided coverage, we would still find that Reliance could not recover from General because we find that there were two "occurrences." One "occurrence" was the taking of the jeep turn signal by Cady. A second "occurrence" was the obtaining of the statement from Blackwood by Dwinnell.

Clearly, each of these incidents were separate and distinct, as they occurred at different times and places, and involved different agents of Reliance. These "occurrences" were related to each other only because they both arose out of the same case and were precipitated by Reliance agents. We therefore reject Reliance's argument that there was a single "occurrence" in its failure to monitor its claims process. Furthermore, as the jury in the California trial made clear, it was the actions of Cady and Dwinnell that caused them to conclude that an award of punitive

damages was proper and they awarded $1,000,000.00 for each of their acts.

For each "occurrence" there is a $500,-000.00 deductible under the terms of the umbrella policy and the reinsurance certificate. Thus for the two "occurrences" there is $1,000,000.00 deductible ($500,000.00 × 2). Since Reliance's obligation under the settlement agreement totaled $912,044.34, a deduction of $1,000,000.00 from that amount leaves nothing to be paid by General.

### VI

We therefore enter judgment in favor of the defendant General Reinsurance Corporation and against the plaintiff Reliance Insurance Company.